# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 22, 2010

No. 09-50683
Summary Calendar

Charles R. Fulbruge III
Clerk

RADAR SOLUTIONS, LTD., doing business as Rocky Mountain Radar, Inc.,

Plaintiff - Appellant

v.

THE UNITED STATES FEDERAL COMMUNICATIONS COMMISSION,

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:07-cv-00344-KC

Before HIGGINBOTHAM, CLEMENT, and SOUTHWICK, Circuit Judges.
PER CURIAM:[*]

The Federal Communications Commission fined Rocky Mountain Radar for producing two types of police radar jammers. The Commission alleged that the jammers harmfully interfered with authorized radio communications – a violation of FCC regulations. Rocky Mountain Radar refused to pay, and the dispute found its way to federal court. The district court granted summary

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-50683

judgment to the Commission, requiring Rocky Mountain Radar to remit the penalty.  Rocky Mountain Radar appeals, and we affirm.

I.

A.

Congress created the Federal Communications Commission to "execute and enforce" the Communications Act of 1934.[1]  The legislature – in the organic statute – delegated to the agency the authority to make regulations "governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications."[2]  The agency's regulatory power would extend over the "manufacture, import, sale, offer for sale, or shipment of such devices" and "the use of such devices."[3]

The Commission has exercised its authority to regulate what it calls intentional radiators – "device[s] that intentionally generate[] and emit[] radio frequency . . . ."[4]  Radio frequency energy is "[e]lectromagnetic energy at any frequency in the radio spectrum between 9 kHz and 3,000,000 MHz."[5]  Any seller must receive the Commission's authorization "prior to marketing" an intentional

---

[1] 47 U.S.C. § 151.

[2] 47 U.S.C. § 302a(a).

[3] 47 U.S.C. § 302a(a).

[4] 47 C.F.R. § 15.3(o).

[5] 47 C.F.R. § 15.3(u).

radiator.[6]   Additionally, no radiator – intentional or otherwise – may cause "harmful interference,"[7] which the Commission defines as "[a]ny emission, radiation or induction that endangers the functioning of a radio navigation service or of other safety services or seriously degrades, obstructs or repeatedly interrupts a radiocommunications service operating in accordance with this chapter."[8] As the district court noted, these regulations fulfill Congress's express intent that "[n]o person shall willfully or maliciously interfere with or cause interference to any radio communications . . . licensed or authorized by or under this chapter . . . ."[9]

## B.

The Commission authorizes the police to use radar – a type of radio energy – to enforce traffic laws.  Police radar can decipher the speed of moving cars by interpreting a phenomenon beloved by middle-school science teachers everywhere – the Doppler effect.  The police radar system sends a radar signal toward an approaching car.  When the radar hits the car, the car's movement adds an audio signal to the original radar.  The combined signal bounces back to the police, where the radar machine removes the radar frequency to process only the remaining audio frequency – to which the car's speed is proportional.[10]

---

[6] 47 C.F.R. § 15.201(b).

[7] 47 C.F.R. § 15.5(b).

[8] 47 C.F.R. § 15.3(m).

[9] 47 U.S.C. § 333.

[10] *See* R. at 90-91.

No. 09-50683

Rocky Mountain Radar produces radar jammers, which the company claims will "scramble" police radar.[11]  According to a Commission expert, all radar jammers "work in the same basic way."[12]  When police radar hits a car equipped with a radar jammer, the jammer mixes the incoming signal with an audio signal artificially produced by the jammer.  The produced audio signal's frequency falls below 9 kHz – and thus outside of the Commission's regulated frequency range.  The jammer then reflects back the original radar signal – combined not only with the natural audio signal created by all moving objects, but also with the artificially created audio signal.  According to Rocky Mountain Radar, the police system "may become confused at having multiple audio signals to process."[13]

## C.

The Commission has long interpreted radar jammers to be unlawful under its regulations governing harmful interference.  In fact, the agency in 1996 issued a public notice warning against the use of jammers: "The intentional use of jammers is considered 'malicious interference' and is strictly prohibited by the Communications Act of 1934, as amended, and by Commission Rules."[14]

Rocky Mountain Radar decided not to heed the Commission's warning.  It

---

[11]R. at 90.

[12]R. at 345.  Rocky Mountain Radar does not on summary judgment dispute this point. *See* R. at 90 (explaining, at least, that the jammer models in this case work in this same general manner).

[13]R. at 91.

[14]R. at 114.

4

continued in the late 1990s to produce its Spirit II line of radar jammers. The Commission cited the company: the Spirit II acted as an intentional radiator designed harmfully to interfere with police radar. The company administratively challenged the determination; the Commission upheld its ruling that the Spirit II violated FCC regulations; and the company appealed the Commission's final determination to the United States Court of Appeals for the 10th Circuit in a case called *Rocky Mountain Radar, Inc. v. Federal Communications Commission.*[15]

The 10th Circuit described that the Spirit II – as expected – "receives a radar signal, then blends the signal with white noise, and confuses the computer inside the radar gun."[16] The question on judicial review boiled down to whether the Commission could classify radar jammers as intentional radiators – devices that intentionally generate and emit radio energy. Rocky Mountain Radar urged that the Commission's conception of the word "generate" made no sense – arguing that "the Spirit II is not covered by FCC rules regulating radiators of radio frequency energy because the device merely reflects a police radar signal and, by itself, cannot produce radio frequency energy."[17] According to the company, reflect does not mean generate.

The Commission countered that "the fact that the original source of the radio frequency energy is external to the device does not place it beyond the

---

[15]158 F.3d 1118 (10th Cir. 1998).

[16]*Id.* at 1120 (quotation marks omitted).

[17]*Id.*

No. 09-50683

Commission's jurisdiction."[18]  Indeed, the jammer "uses the radar signal as a source of RF [(radio frequency)] energy, modulates the signal electronically to generate a different RF signal, and emits that RF signal to cause interference to police radars."[19]  According to the Commission, the company could find no solace in the fact that it designed the Spirit II "to function only when it is illuminated by a police radar signal."[20]

The 10th Circuit agreed and upheld the Commission's determination that radar jammers operate as harmful intentional radiators, deferring to the agency's interpretation of its own regulations.  The court explained, "When an agency applies its regulations to complex or changing circumstances . . . this calls upon the agency's unique expertise and policymaking prerogatives and courts must presume the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers."[21]  The 10th Circuit continued, "The FCC's decision to give 'generate' a more expansive treatment than that advocated by [the company] is consistent with the ordinary meaning of the term as in 'create,' 'produce,' or 'propagate.'"[22]  The court opined that "a broad reading of the word furthers a stated aim of the Communications Act . . . . [and] can also be reconciled with the purpose of the regulations, which is to regulate and minimize interference between users of the electromagnetic

---

[18]*Id.* at 1121 (citations, alterations, and quotation marks omitted).

[19]*Id.* (citations and quotation marks omitted).

[20]*Id.*

[21]*Id.* at 1124 (citing *Marin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 151 (1991)) (quotation marks omitted).

[22]*Id.* (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY).

No. 09-50683

spectrum."[23]  In the end, the 10th Circuit did not find the Commission's order plainly erroneous or inconsistent with regulation.[24]

D.

The Commission in 2005 learned that the company had produced two new lines of radar jammers – the RMR-C450 and RMR-S201.[25]  The Commission asked the company to provide it with information about and samples of the devices.  Rocky Mountain Radar complied.  After testing, the Commission concluded that both devices – like the Spirit II – functioned as intentional radiators designed harmfully to interfere with police radar.

Regarding the S201: "When the scrambler is hit by a [radar] signal it runs it thorough the mixer, adding the FM chirp [audio signal] to mix up the signal and using the antenna, reflect back this new signal to the radar gun."[26]  The Commission explained: "By definition if an FM chirp generator is mixed with an incoming signal and sent to an antenna, then it is . . . an intentional radiator subject to Section 15.209."[27]  The agency concluded that the device "is an [unlicensed] intentional radiator" and "was designed to intentionally interfere with a licensed radio service and is thus in violation of Section 15.5 of our

---

[23]*Id.*

[24]*Id.* (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

[25]The C450 functions as a dual radar detector and radar jammer, and the S201 has only jammer capabilities.

[26]R. at 463.

[27]R. at 463.

No. 09-50683

rules."[28]    The Commission found the C450 to work in the same unlawful manner.[29]

The Commission sent the company a Notice of Apparent Liability Forfeiture for $25,000.  Rocky Mountain Radar did not respond, so the agency issued a Forfeiture Order directing the company to pay the penalty.[30]

Instead, Rocky Mountain Radar – oddly enough – sued the Commission in federal court.  The company alleged that the Commission had, among other misdeeds, ignored its request to set aside the forfeiture.  The Commission counterclaimed for the payment of $25,000.  The district court concluded that it had no jurisdiction over the company's claims, a ruling that the company does not appeal.  The district court did find jurisdiction over the Commission's counterclaim, noting that an agency may bring a forfeiture action through a de novo trial in federal district court.[31]

All parties agreed that the case came down to whether the C450 and S201 are "intentional radiators" under the Commission's regulations.  After motions

---

[28]R. at 465.

[29]*See* R. at 309 & 316.

[30]*See* 47 U.S.C. § 503(b)(1) (stating that any person who has "willfully or repeatedly failed to comply with any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter . . . shall be liable to the United States for a forfeiture penalty"); *see generally Action for Children's Television v. Federal Communications Commission*, 59 F.3d 1249, 1253-54 (D.C. Cir. 1995) (describing the Commission's forfeiture procedures).

[31]*See* 47 U.S.C. § 504(a) ("The forfeitures provided for in this chapter shall be payable into the Treasury of the United States, and shall be recoverable . . . in a civil suit in the name of the United States brought in the district where the person or carrier has its principal operating office . . . . *Provided*, That any suit for the recovery of a forfeiture imposed pursuant to the provisions of this chapter shall be a trial de novo. . . .").

No. 09-50683

from both sides, the district court granted the Commission summary judgment. The court held that the facts indisputably showed the company's jammers to fit the Commission's regulatory definition of intentional radiators. Rocky Mountain Radar appeals from that final judgment.

## II.

## A.

We must verify that we have jurisdiction, even though no party challenges our ability to hear this appeal.[32] Indeed, "every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it."[33]

The Communications Act creates a complicated review process. One federal court has called it a "maze."[34] Generally, only a court of appeals has jurisdiction to hear challenges to the Commission's orders.[35] So a judicial attack on the Commission's regulations (or interpretations thereof) usually has to originate in a circuit court. "The district courts, however, have a sliver of the

---

[32]*Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000) ("[W]e have a duty to consider objections to our jurisdiction *sua sponte*.").

[33]*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (citation and quotation marks omitted).

[34]*Action for Children's Television v. Federal Communications Commission*, 827 F. Supp. 4, 10 (D.D.C. 1993) ("The maze of jurisdictional rules governing the review of FCC matters is difficult to navigate . . . .").

[35]*See* 47 U.S.C. § 402(a).

No. 09-50683

jurisdictional pie for enforcement of FCC orders imposing a monetary forfeiture penalty."[36]  Indeed, 47 U.S.C. § 504(a) establishes that the Commission may bring a de novo forfeiture enforcement action in federal district court.

But the district court's jurisdiction may be limited – even in a forfeiture action.  The district court can hear a factual dispute as to whether a defendant has violated the Commission's rules.  But can the district court hear – by way of defense – that the Commission's rules are themselves unlawful?

Suppose Broadcaster allegedly violates the Commission's regulation XYZ. The Commission issues a forfeiture order, but Broadcaster does not pay.  The Commission sues in district court to collect.  The Commission puts on proof of Broadcaster's actions that violate XYZ.  Broadcaster defends that he did not commit the alleged actions.  So far no apparent jurisdictional problem.

But suppose, too, that Broadcaster argues in the alternative that XYZ violates the Constitution.  Broadcaster, in other words, directly challenges the validity of the governing agency regulation – a claim usually subjected exclusively to appellate review.  Does the district court have jurisdiction to hear the defense?

Our sister circuits have split on the issue.[37]  On the one hand, the 8th Circuit has held that "to ask the district court to decide whether the regulations are valid violates the statutory requirements."[38]  District courts in the 8th

---

[36]*Rocky Mountain Radar*, 158 F.3d at 1121 (citation and quotation marks omitted).

[37]*See Prayze FM v. Federal Communications Commission*, 214 F.3d 245, 250-51 (2d Cir. 2000) (citing cases).

[38]*United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000).

No. 09-50683

Circuit cannot hear these sorts of challenges even in a de novo forfeiture trial. On the other hand, the 6th Circuit allows its district courts to entertain all relevant subject matters in a Commission forfeiture proceeding.[39] Dicta from D.C. Circuit caselaw suggests that it would side with the 6th Circuit.[40]

We need not today decide the question. Read properly, Rocky Mountain Radar before the district court defended that the Commission had failed to establish the necessary facts to prove its jammers to be intentional radiators. According to the company, "There exist genuine issues of material fact [that the jammers are intentional radiators] to be resolved in a de novo trial as required by statute."[41] The company on appeal assumes the same posture – suggesting that summary judgment cannot stand because factual issues remain unanswered. The company does not challenge the validity of the regulations. The Communications Act expressly authorizes the district court to hear factual disputes in de novo forfeiture collection actions, so we can in this case review the district court's final judgment.

---

[39] *United States v. Any & All Radio Station Transmission Equip.*, 204 F.3d 658, 667 (6th Cir. 2000) ("Congress presumably could have created a streamlined forfeiture remedy that excluded certain defenses by giving claimants the opportunity to raise those defenses in some other forum. But it did not do so.").

[40] *See, e.g.*, *Action for Children's Television*, 59 F.3d at 1256 ("[T]he district court's jurisdiction over the [broadcaster's] challenge to the constitutionality of the forfeiture statute is no threat to the jurisdiction of the court of appeals because review of a Commission order imposing a forfeiture (in the defense against a collection suit) would itself be in the district court, not in the court of appeals."); *Pleasant Broadcasting Co. v. Federal Communications Commission*, 564 F.2d 496, 501 (D.C. Cir. 1977) ("Thus, absent strong evidence to the contrary in the legislative history, or a showing that the special review mechanism is unavailable or inadequate, we must assume that the mechanism selected by Congress – a trial de novo in the district court – is the exclusive means for review of a forfeiture order entered by the Commission.").

[41] R. at 437.

No. 09-50683

B.

We continue to the merits, reviewing de novo the grant of summary judgment and applying the same standards as the district court.[42] "Summary judgment is appropriate where the competent summary judgment evidence demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[43] Both parties agree that the main issue centers on whether C450 and S201 are "intentional radiators" under the Commission's regulations.

The Commission ran three tests on each of the jammers, and Rocky Mountain Radar argues that the tests' results do not provide sufficient evidence for summary judgment – and neither do the Commission's conclusory interpretations of those results. One test involved a police radar gun aimed at a jammer-equipped car as it drove down the road. According to the company, the police radar machine correctly read the car's speed, so the jammer must not interfere with police radar – and cannot be an intentional radiator.

Ultimately, though, no issues of material fact remain that the jammers fit the regulatory definition of intentional radiators – notwithstanding the possibility of either the jammers' inefficacy or the inconclusiveness of any test results. Rocky Mountain Radar's founder and owner admitted – both in an expert report[44] and at deposition[45] – that the jammers work by receiving a radar

---

[42]*Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 871 (5th Cir. 2009).

[43]*Id.*

[44]R. at 90-91.

[45]Supp. R. at 1-6.

No. 09-50683

signal, mixing the signal with an audio frequency, and through an antenna reflecting the new conglomerate signal back to the police unit.[46] Jammers that function in this way meet the regulatory definition of an intentional radiator – something the company has known since the 10th Circuit twelve years ago handed down its decision in *Rocky Mountain Radar*.[47]

III.

By the company's own admissions, there is no dispute of material fact that Rocky Mountain Radar's unlicensed police jammers generate and emit radio energy. The company designed its jammers to interfere with police radio communications, and – by obstructing law enforcement's effort to keep our roads free from careless drivers – the company endangers the public's safety. The Commission's regulations expressly forbid all of this. The district court did not err in granting summary judgment to the Commission and ordering the company

---

[46]The company stresses in its briefs that intentional radiators must emit "radio" energy – but that the Commission never measured the frequency of the signal reflected by the jammers. According to the company, the Commission thus has failed to establish one of the factual predicates for classifying a device as an intentional radiator. A specious argument to be sure, because the company admits in its expert report that the reflected signal falls within the radio range of the electromagnetic spectrum. *See* R. at 93 ("The FCC argues that the scrambler changes the radio energy it intercepts. This is completely true. Any moving object in existence will also change the radio energy reflected back to the radar gun.").

[47]We, of course, adopt the 10th Circuit's reasoning that the "ordinary meaning" of the word "generate" includes the type of action performed by radar jammers. *See Rocky Mountain Radar*, 158 F.3d at 1124. It is of no moment that the police radar is the first source of radio energy. Consider this dictionary example: Mountain ranges "generate" more heat than low-lying plains. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 945 (1961). It is the sun in this example – like the police radar in our case – that is the first source of energy, and radar jammers do more work than inert mountains to generate energy.

No. 09-50683

to pay the forfeiture.

AFFIRMED.