**RADAR SOLUTIONS, LTD. d/b/a Rocky Mountain Radar, Inc., Plaintiff,**

v.

**The UNITED STATES FEDERAL COMMUNICATIONS COMMISSION, Defendant.**

**United States of America, Counterclaimant,**

v.

**Radar Solutions, Ltd. d/b/a Rocky Mountain Radar, Inc., Counterclaim Defendant.**

Civil Action No. EP–07–CV–0344–KC.

United States District Court, W.D. Texas, El Paso Division.

June 24, 2009.

716

H. Christopher Mott, Gordon Mott & Davis PC, El Paso, TX, Kim J. Seter, Greenwood Village, CO, for Plaintiff/Counterclaim Defendant.

James F. Gilligan, Assistant United States Attorney, San Antonio, TX, for Defendant/Counterclaim Defendant.

## ORDER

KATHLEEN CARDONE, District Judge.

On this day, the Court considered Defendant United States Federal Communications Commission's ("FCC") "Motion to Dismiss, and/or, in the Alternative, Motion for Summary Judgment" ("Government's Motion") (Doc. No. 42); Plaintiff Radar Solutions, Ltd., doing business as Rocky Mountain Radar, Inc.'s "Response to Defendant's Motion to Dismiss and/or, in the Alternative, Motion for Summary Judgment" ("Plaintiff's Response") (Doc. No. 47); and the Government's "Reply in Support of Defendant's Motion to Dismiss and/or, in the Alternative, Motion for Summary Judgment" ("Government's Reply") (Doc. No. 48). For the reasons set forth herein, the Government's Motion is **GRANTED.**

The Court also considered Plaintiff's "Motion for Judgment on the Pleadings or Alternatively for Summary Judgment on the Counterclaim of Defendant FCC and Related Relief" ("Plaintiff's Motion") (Doc. No. 41); the Government's "Response to Plaintiff's Motion for Judgment on the Pleadings or Alternatively, for Summary Judgment on the Counterclaim of Defendant FCC and Related Relief;" ("Government's Response") (Doc. No. 43); and Plaintiff's "Amended Reply to Response of FCC to Plaintiff's Motion for Judgment on the Pleadings or Alternatively for Summary Judgment on the Counterclaim of Defendant FCC and Related Relief" ("Plaintiff's Reply") (Doc. No. 46). For the reasons set forth herein, Plaintiff's Motion is **DENIED.**

## I. BACKGROUND

The following facts are derived from the parties' pleadings, the exhibits attached to the parties' motions and responsive briefs, the Government's "Proposed Undisputed Facts" in the Appendix to its Motion

("Government's Facts"); Plaintiff's "Response to [the Government's] Proposed Undisputed Facts," Exhibit I of its Response ("Plaintiff's Facts"); and Plaintiff's "Proposed Undisputed Facts" in the Appendix to its Motion ("Plaintiff's Facts II").

## A. The Parties

Plaintiff is a Nevada corporation qualified to do business in the State of Texas with its principal offices and manufacturing facilities in El Paso, Texas. Pl.'s Facts II ¶ 1; Pl.'s Compl. ¶ 1. Plaintiff manufactured, marketed, offered for sale, and sold the two devices at issue in this case—the RMR–C450 and the RMR–S201. Gov't's Facts ¶ 17; Pl.'s Facts ¶ 17.

The Federal Communications Commission ("FCC") is an agency of the United States that was created pursuant to the Communications Act of 1934, 48 Stat. 1064, as amended ("the Communications Act" or "the Act"). *See also* 47 U.S.C. § 151. The purpose of this Act is "to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority[.]" *Id.* § 301. Congress created the FCC to "execute and enforce the provisions" of the Act, *id.* § 151, and granted the FCC authority to promulgate regulations "governing the interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications," *id.* § 302a(a). Congress also granted the FCC authority to promulgate regulations that are "applicable to the manufacture, import, sale, offer for sale . . . and to the use of such devices." *Id.*[1]

Pursuant to its authority granted by Congress, the FCC has created a comprehensive set of regulations "under which an intentional, unintentional, or incidental radiator may be operated without an individual license." 47 C.F.R. § 15.1(a). An "intentional radiator" is "[a] device that intentionally generates and emits radio frequency energy by radiation or induction." *Id.* § 15.3(*o*). With certain exceptions not relevant to the instant case, "all intentional radiators operating under the provisions of this part" must be licensed by the FCC "prior to marketing." 47 C.F.R. § 15.201(b). The regulations further state that "no person shall sell or lease . . . any radio frequency device unless . . . such device has been authorized by the [FCC] in accordance with the rules in this chapter" or "such device complies with all applicable administrative . . . technical, labeling and identification requirements specified in this chapter." 47 C.F.R. § 2.803(a). The regulations further state that "[u]nless specifically exempted, the operation or marketing of an intentional or unintentional radiator that is not in compliance" with the relevant provisions of 47 C.F.R. Part 15 is prohibited under the Act. *Id.* § 15.1(b).

Under its "General conditions of operation," the FCC requires that "no harmful interference [be] caused" by the operation of an intentional radiator, "and that interference must be accepted that may be caused by the operation of an authorized radio station, by another intentional or unintentional radiator, by industrial, scientific and medical (ISM) equipment, or by an incidental radiator." *Id.* § 15.5(b). "Harmful interference" is defined as "[a]ny

---

1. Section 302a further states that "[n]o person shall manufacture, import, sell, offer for sale, or ship devices or home electronic equipment and systems, or use devices, which fail to comply with regulations promulgated pursuant to this section."

emission, radiation or induction that endangers the functioning of a radio navigation service or of other safety services or seriously degrades, obstructs or repeatedly interrupts a radiocommunications service operating in accordance with this chapter." *Id.* § 15.3(m). This prohibition on harmful interference further carries out Congress' command that "[n]o person shall willfully or maliciously interfere with or cause interference to any radio communications or any station licensed or authorized by or under the Act." 47 U.S.C. § 333.

Police radar uses a narrowly defined portion of the radio spectrum. Police Radar is authorized and regulated by the FCC as a radiolocation service. *See* 47 C.F.R. §§ 90.101, 90.103; *see also* Gov't's Facts ¶ 6; Pl.'s Facts ¶ 6. Police radar works by emitting a radio signal toward a moving car that reflects off the car and is received by the radar unit, which can calculate the speed of the car based on the Doppler Shift in the reflected signal. Gov't's Facts ¶ 7; Pl.'s Facts ¶ 7.

## B. The Spirit II Case

On February 12, 1997, the FCC issued an Official Citation to Plaintiff advising that the manufacture and marketing of its Rocky Mountain Spirit II radar jammer violated 47 U.S.C. § 302a[2] and 47 C.F.R. § 2.803. *See* Pl.'s Resp. Ex. G (Official Citation, Feb. 13, 1997). On February 24, 1997, Plaintiff filed a response to the FCC's Official Citation, arguing that the device was not an "intentional radiator" and thus not covered by the FCC's authorization rules. *See In re Rocky Mountain Radar,* 12 FCC Rcd. 22453 ¶ 3 (Dec. 10, 1997) (Memorandum Opinion and Order)

("1997 FCC Order"). Both the FCC's Office of Engineering Technology (OET) and Compliance Information Bureau (CIB) reviewed Plaintiff's response and documentation, and they rejected Plaintiff's arguments. *Id.* ¶ 4. These offices determined that the Spirit II constituted an "intentional radiator" under 47 C.F.R. 15.3(*o* ) and did not qualify for any exemption. *Id.* Plaintiff filed an Emergency Petition for Stay of Official Citations on August 15, 1997, and an Application for Review and Request for Expedited Action on August 18, 1997. *Id.* ¶ 5. In both of these documents, Plaintiff argued that the Spirit II was not an "intentional radiator" because "it does not and physically cannot generate or emit radio frequency energy." *Id.* ¶ 5.

On December 10, 1997, the FCC rejected Plaintiff's arguments that the Spirit II was not an "intentional radiator." Specifically, the FCC stated that:

[The Spirit II] is designed to function only when it is illuminated by a police radar signal. The Spirit II device uses the radar signal as a source of RF ["radio frequency"] energy,[3] modulates the signal electronically to generate a different RF signal, and emits that RF signal to cause interference to police radars. Thus, we disagree with Rocky Mountain Radar's assertion that the device does not generate and emit RF energy. The fact that the original source of the radio frequency energy is external to the device does not place the Spirit II beyond the Commission's jurisdiction. When the device is in operation, it uses a source of RF energy to itself generate a new RF signal and emit

---

**2.** The Official Citation and subsequent Memorandum Opinion and Order both cite to 47 U.S.C. § 302. However, § 302 was repealed on June 5, 1936, 49 Stat. 1375, and the relevant language is in 47 U.S.C. § 302a.

**3.** Radio frequency (RF) energy is defined as "[e]lectromagnetic energy at any frequency in the radio spectrum between 9kHz and 3,000,-000 Mhz." 47 C.F.R. § 15.3.

this signal into space to cause interference.

*Id.* ¶ 7.

The FCC also noted that Plaintiff's own tests demonstrated that the Spirit II contained RF circuitry which was designed "for the generation and emission of radio frequency energy." *Id.* This circuitry consisted specifically of "a mixer diode inside a wave guide cavity with ridged antenna and matching screw," which "to have any purpose" must be designed to interact with "incident radiation at microwave frequencies." *Id.* Accordingly, given that the Spirit II was designed to generate and emit RF energy, the FCC held that "the Spirit II, *and any other similar device,* meet the definition of an intentional radiator contained in Section 15.3(*o*) of the rules" and that "marketing of the Spirit II *and any other similar device* without FCC equipment authorization is in violation of [47 C.F.R. §§ 15.201(a), 2.803]." *Id.* (emphasis added).

On October 19, 1998, the Court of Appeals for the Tenth Circuit affirmed the 1997 FCC Order. *Rocky Mountain Radar, Inc. v. FCC,* 158 F.3d 1118, 1119 (10th Cir.1998). Specifically, the Tenth Circuit held that the FCC's determination that the Spirit II "generate[s]" a frequency despite only reflecting and modifying a police radar signal was "neither plainly erroneous nor inconsistent with the regulation." *Id.* at 1124 (quoting *Thomas Jefferson v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)) (quotes and internal brackets omitted). Accordingly, the Tenth Circuit affirmed the FCC's holding that the Spirit II was "intentional radiator" and therefore in violation of FCC regulations and its empowering statutes. *Id.*

## C. The Instant Case

### 1. Administrative facts and procedure

The FCC states that in 2005, it began receiving several informal complaints alleging that Plaintiff was manufacturing and marketing unauthorized police radar jammers in the United States. *See* Gov't's Mot. Ex. 1 (Notice of Apparent Liability for Forfeiture, Jan. 31, 2007 ("NAL")) ¶ 2. On August 9, 2005, the Spectrum Enforcement Division of the FCC's Enforcement Bureau sent Plaintiff a Letter of Inquiry seeking information about several products that Plaintiff was then manufacturing, marketing, offering for sale, and selling. Gov't's Facts ¶¶ 16–17; Gov't's Mot. Ex. 2 (Letter of Inquiry from FCC to Plaintiff, Aug. 9, 2005). Among these products were the RMR–C450 and the RMR–S201. Letter of Inquiry 7. Plaintiff provided the FCC with samples of the RMR–C450 and the RMR–S201 units for testing. Gov't's Facts ¶ 17.

The FCC tested these devices and generated two testing reports with findings. Gov't's Mot. Ex. 4 (Post Grant Sample Technical Report for the RMR–C450, Nov. 15, 2005 ("FCC's RMR–C450 Report")); *id.* Ex. 5 (Post Grant Sample Technical Report for the RMR–S201, Nov. 15, 2005 ("FCC's RMR–S201 Report")). The FCC's RMR–C450 Report stated that "the device contains an intentional radiator or transmitter that operates on the same frequencies as licensed police radar." FCC's RMR–C450 Report 10. Accordingly, the report concluded that the device violated FCC rules and regulations governing the marketing and certification of intentional radiators. *Id.* Similarly, the FCC's RMR–S201 Report stated that the device "was designed to intentionally interfere with a licensed radio service and is thus in violation" of the FCC's rules and regulations governing the marketing and certification of intentional radiators. FCC's RMR–S201 Report 5.

On January 31, 2007, the FCC issued Plaintiff a Notice of Apparent Liability for

Forfeiture ("NAL") for Plaintiff's marketing of the RMR–C450 and the RMR–S201. The NAL cited the Letter of Inquiry and the FCC's subsequent Post Grant Sample Technical Reports and concluded that both the RMR–C450 and RMR–S201 were "intentional radiators" and that Plaintiff's marketing of the devices was unlawful. NAL ¶ 7–10. The FCC then cited Plaintiff's previous Official Citation, which Plaintiff received in 1997 for the Spirit II. *Id.* ¶ 15. The FCC proposed a forfeiture of $25,000. *Id.* The FCC directed Plaintiff to either pay the forfeiture or file a written statement seeking reduction or cancellation of the forfeiture. *Id.* ¶ 16.

Around this time, the FCC also began issuing Official Citations to the distributors of Plaintiff's products. *See, e.g.,* Gov't's Mot. Ex. 8 (Official Citation to Eugene Pritsker, President of the Twister Group, Inc., Jan. 31, 2007). These Citations outlined the procedures taken against Plaintiff regarding the RMR–C450 and RMR–S201. *Id.* at 3. These Citations also referred specifically to Plaintiff's NAL. *Id.* These Citations further stated that Plaintiff's devices were intentional radiators in violation of FCC rules and regulations. *Id.* These Citations warned that any continued sale or distribution of these devices would result in fines. *Id.*

On August 16, 2007, the FCC issued a Forfeiture Order, directing Plaintiff to pay the proposed penalty. Forfeiture Order, Aug. 16, 2007, 22 FCC Rcd. 15174; Gov't's Mot. Ex. 7. To date, Plaintiff has not paid this fine. Gov't's Facts ¶ 22.

### 2. Procedure in this Court

On October 12, 2007, Plaintiff filed a Complaint in this Court, alleging that it had previously filed a Petition for Reconsideration and Cancellation of Forfeiture to the FCC's NAL on March 2, 2007, and that it never received any reply from the FCC. *See* Pl.'s Compl. ¶ 8. Plaintiff further

alleges that the FCC violated its own rules, regulations and procedures by using its NAL against Plaintiff in other proceedings to Plaintiff's detriment, in violation of 47 U.S.C. § 504(c), and in violation of the Plaintiff's Fifth Amendment's right to due process. *Id.* ¶¶ 13–44. Plaintiff claims the FCC did so by referencing the NAL in its Official Citations to Plaintiff's distributors. *Id.* Plaintiff also alleges that the FCC intentionally interfered with its relationships and contract performance between Plaintiff and its distributors. *Id.* Plaintiff seeks a review of the FCC's actions, preliminary injunctive relief, injunctive relief, and damages. *Id.*

On February 4, 2008, the Government filed its Original Answer and Counterclaim. In its Counterclaim, the Government seeks a judgment of enforcement of its Forfeiture Order against Plaintiff. Gov't's Original Answer and Countercl. ¶ 51.

On April 2, 2009, Plaintiff filed its instant Motion, seeking judgment on the pleadings and summary judgment against the Government's Counterclaim. The Government filed its Response on April 21, 2009, and Plaintiff filed its Reply on May 4, 2009.

On April 16, 2009, the Government filed its instant Motion, seeking judgment on the pleadings, dismissal for lack of jurisdiction, and summary judgment of Plaintiff's claims. Plaintiff filed its Response on May 6, 2009, and the Government filed its Reply on May 18, 2009.

### II. STANDARD

The Government first argues that this Court lacks jurisdiction over Plaintiff's claims. Gov't's Mot. 8. A motion to dismiss pursuant to Rule 12(b)(1) must be considered before any other challenge, because a court must have jurisdiction be-

fore determining the validity of a claim. *Moran v. Kingdom of Saudi Arabia,* 27 F.3d 169, 172 (5th Cir.1994). In ruling upon such motion, a district court is free to weigh the evidence and satisfy itself as to its power over the case. *MDPhysicians & Assoc., Inc. v. State Bd. of Ins.,* 957 F.2d 178, 181 (5th Cir.1992). In making this ruling, the district court may rely upon: (1) the complaint alone, (2) the complaint supplemented by undisputed facts in the record, or (3) the complaint supplemented by undisputed facts in addition to the court's resolution of disputed facts. *Barrera–Montenegro v. United States and Drug Enforcement Admin.,* 74 F.3d 657, 659 (5th Cir.1996).

■ The standard of reviewing a motion to dismiss pursuant to 12(b)(1) depends upon whether the defendant makes a facial or factual challenge to the plaintiff's complaint. *Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir.1981). When the defendant makes a facial attack by the mere filing of a Rule 12(b)(1) motion, the trial court looks to the sufficiency of the plaintiff's allegations, which are presumed to be true. *Id.* When the defendant makes a factual attack by providing affidavits, testimony, and other evidence challenging the court's jurisdiction, the plaintiff must submit facts in support of the court's jurisdiction and thereafter bear the burden of proving that the trial court has subject matter jurisdiction. *Middle S. Energy, Inc. v. City of New Orleans,* 800 F.2d 488, 490 (5th Cir.1986).

■ Assuming this Court may exercise jurisdiction over Plaintiff's claims, both Plaintiff and the Government have sought a judgment on the pleadings. A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Doe v. MySpace, Inc.,* 528 F.3d 413, 418 (5th Cir.2008) (citations omitted). A mo-

tion to dismiss pursuant to Rule 12(b)(6) challenges a complaint on the basis that it fails to state a claim upon which relief may be granted. FED.R.CIV.P. 12(b)(6). In ruling on a Rule 12(b)(6) motion, the court must accept well-pleaded facts as true, and view them in a light most favorable to the plaintiff. *Calhoun v. Hargrove,* 312 F.3d 730, 733 (5th Cir.2002); *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir.2000). Still, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) (internal citations and quotation marks omitted); *see also Plotkin v. IP Axess, ·Inc.,* 407 F.3d 690, 696 (5th Cir. 2005) ("But a court need not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

Though a complaint need not contain "detailed" factual allegations, still the "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly,* 127 S.Ct. at 1965 (internal citation omitted). Thus, to survive a motion to dismiss, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Id.* at 1974. Nevertheless, "a well-pleaded complaint may proceed even if its strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 1965 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

Both parties have also sought summary judgment. Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Warfield v. Byron,* 436 F.3d 551, 557 (5th Cir.2006). The substantive law identifies which facts are material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 189 (5th Cir. 1996). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Ellison,* 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Wallace v. Texas Tech. Univ.,* 80 F.3d 1042, 1046–1047 (5th Cir.1996). If the moving party meets its initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). The nonmovant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Warfield,* 436 F.3d at 557 (quoting *Freeman v. Texas Dep't of Crim. Justice,* 369 F.3d 854, 860 (5th Cir.2004)). Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is

so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## III. DISCUSSION

### A. Plaintiff's claims

▮ As stated above, the first question a Court must address when analyzing a party's claims is whether the Court is vested with jurisdiction to hear such claims. *Moran,* 27 F.3d at 172. As an agency of the United States, the FCC is liable only to the extent that Congress has waived its sovereign immunity. *See, e.g., Castro v. United States,* 560 F.3d 381, 386 (5th Cir.2009) ("As the sovereign, the United States is immune from suit unless, and only to the extent that, it has consented to be sued.") (quoting *Truman v. United States,* 26 F.3d 592, 594 (5th Cir.1994) (citing *Fed. Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994))); *St. Tammany Parish, ex rel. Davis v. Federal Emergency Mgmt. Agency,* 556 F.3d 307, 316 (5th Cir.2009) (recognizing sovereign immunity extends to the United States and "its departments") (quoting *Williamson v. Dep't of Agriculture,* 815 F.2d 368, 373 (5th Cir.1987)). "Because sovereign immunity is jurisdictional in nature, Congress's waiver of it must be unequivocally expressed in statutory text and will not be implied." *Davis,* 556 F.3d at 316 (internal brackets, quotations and citations omitted). Moreover, "[i]t is well settled ... that a waiver of sovereign immunity must be specific and explicit and cannot be implied by construction of an ambiguous statute." *Id.* (quoting *Petterway v. Veterans Admin. Hosp.,* 495 F.2d 1223, 1225 (5th Cir.1974)).

Congress has waived immunity to a limited extent against the United States and its agencies with the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq* ("FTCA").

The FTCA states that district courts have jurisdiction:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1); *see also Castro*, 560 F.3d at 386.

■ Nevertheless, there are multiple exceptions to the waiver of sovereign immunity granted under the FTCA. Particularly relevant is the requirement that Plaintiff exhaust all administrative remedies before filing a suit in a district court against an agency. *See* 28 U.S.C. § 2675; *see also In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 252 n. 3 (5th Cir.2006); *Izen v. Catalina*, 398 F.3d 363, 367 (5th Cir.2005). Section 2675(a) states that a plaintiff cannot institute a claim against the United States unless "the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing[.]" An administrative claim is a jurisdictional prerequisite, and failure to bring an administrative claim bars a plaintiff from subsequently bringing the

claim in this Court. *See Jackson v. Widnall*, 99 F.3d 710, 716 n. 10 (5th Cir.1996); *Shah v. Quinlin*, 901 F.2d 1241, 1244 (5th Cir.1990).[4]

■ "A claim is properly presented within the meaning of § 2675(a) when the agency is given sufficient written notice to commence investigation and the claimant places a value on the claim." *Transco Leasing Corp. v. United States*, 896 F.2d 1435, 1442 (5th Cir.1990) (citation omitted); *see also Bryan v. Stevens*, 169 F.Supp.2d 676, 684 (S.D.Tex.2001). There is no evidence that Plaintiff made any attempt to present an administrative claim to the FCC prior to filing suit. Indeed, the only evidence in the record is to the contrary. *See* Gov't's Mot. Ex. 9 (Duignan Decl.) ¶¶ 3–4 (stating that the FCC received no administrative claim).[5] Because Plaintiff has failed to provide evidence that it filed an administrative complaint with the FCC, Plaintiff has failed to exhaust its administrative remedies regarding its claims under the FTCA, and these claims must be dismissed as a matter of law. *See Shah*, 901 F.2d at 1244.

■ Assuming Plaintiff had exhausted all administrative remedies, Plaintiff's claims still do not survive. The FTCA only waives immunity against the Government so as to make it liable "to the same extent as a private individual under

---

**4.** Plaintiff also cites 47 U.S.C. § 407 as grounds for the Court's jurisdiction. Pl.'s Resp. 5. Section § 407, however, is wholly inapposite and involves the right of a third-party complainant to file suit for damages against a carrier who has failed to comply with an FCC order. Such are not the circumstances of this case.

**5.** Plaintiff did write a letter to the FCC on September 6, 2005, protesting the FCC's letters to Plaintiff's distributors inquiring into the marketing and distribution of the RMR–C450 and RMR–S201. *See* Gov't's Mot. Ex.

3 (Letter from Michael Churchman to Susan Magnott, Sep. 6, 2005). However, Plaintiff does not argue that this letter represents an administrative claim, and the letter fails to meet the minimum requirements of an administrative claim. The letter merely protested the FCC's investigation, cited no breach of FCC regulations, and provided no stated value for any purported claim. *See id.* Moreover, the letter was sent before the FCC issued any of its NAL's to Plaintiff's distributors, which is the alleged violation at issue in this case. *See id.*

like circumstances;" it does not create any new cause of action. *Meister v. Tex. Adjutant Gen.'s Dep't,* 233 F.3d 332, 336–37 (5th Cir.2000) (quoting *Feres v. United States,* 340 U.S. 135, 141, 71 S.Ct. 153, 95 L.Ed. 152 (1950)). In other words, Plaintiff must show the FCC acted in a manner actionable under state tort laws to be liable under the FTCA. *See, e.g., Hannah v. United States,* 523 F.3d 597, 601 (5th Cir. 2008); *In re Supreme Beef Processors, Inc.,* 468 F.3d at 252. Plaintiff has failed to allege that the FCC has acted in any negligent manner in its Complaint. In fact, the only claim Plaintiff raises under state law is "Intentional Interference with a Beneficial Business Relationship" which is an intentional tort under Texas law. *See Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 713 (Tex.2001); Pl.'s Compl. ¶¶ 30–35. This claim fails under the "intentional tort" exception to the FTCA and does not survive a defense of sovereign immunity. *See* 28 U.S.C. § 2680(h) (specifically barring claims against the Government "arising out of . . . interference with contract rights"); *Supreme Beef Processors,* 468 F.3d at 252.

Having failed to demonstrate a cause of action under the FTCA, Plaintiff's last hope is to cite a federal law that creates a private right of action. Plaintiff's claims stem from Defendant's alleged violations of its own implementing statutes and procedures, specifically 47 U.S.C. § 504(c).[6] However, § 504(c) creates no private right of action. "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (citing *Touche Ross & Co. v.*

*Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)); *see also Casas v. Am. Airlines,* 304 F.3d 517, 520–21 (5th Cir.2002); *Kinzie v. Dallas County Hosp. Dist.,* 239 F.Supp.2d 618, 637 (N.D.Tex.2003). Without the requisite statutory language creating a private remedy, "a cause of action does not exist and courts may not create one, no matter how desirable that may be as a policy matter, or how compatible with the statute." *Alexander,* 532 U.S. at 286–87, 121 S.Ct. 1511 (citations omitted); *see also Anderson v. Jackson,* 556 F.3d 351, 356 (5th Cir.2009) (for a statute to create a privately enforceable right that may be enforced through 42 U.S.C. § 1983, the statute "must unambiguously confer substantive rights upon a class of beneficiaries") (citing *Johnson v. Housing Auth. of Jefferson Parish,* 442 F.3d 356, 359 (5th Cir.2006)); *Guerra v. Wedge Mgmt., Inc.,* No. C.A.C.–05–580, 2006 WL 14568, at *2 (S.D.Tex. Jan. 3, 2006); *TWU Local 555 v. Sw. Airlines Co.,* No. 3:02–CV–554P, 2002 WL 31245372, at *2–3 (N.D.Tex. Oct. 1, 2002).

Plaintiff concedes that § 504(c) "does not provide a specific right of action for damages[.]" Pl.'s Resp. 7. Moreover, Plaintiff provides no subsequent argument demonstrating that the statute or promulgated regulations otherwise allow for injunctive relief against the FCC. At most, Plaintiff might possibly claim that § 504 generally provides for declaratory relief against the Government if it acts too slowly to initiate collection proceedings. *See Pleasant Broadcasting Co. v. FCC,* 564 F.2d 496, 502 (D.C.Cir.1977) ("If . . . a licensee is suffering from demonstrably adverse consequences from government delay, we assume the licensee could bring

---

**6.** Plaintiff also cites the FCC's alleged failure to address Plaintiff's Response to the NAL pursuant to 47 C.F.R. § 1.106. *See* Pl.'s Compl. ¶ 22. However, as will be discussed later, there is no evidence on the record provided by either party that the FCC received any response by Plaintiff to the NAL.

a declaratory judgment action against the United States in the district court. . . ."). However, that does not grant a cause of action for the FCC's alleged violations under § 504(c). Without concomitant language or clear statutory intent to create a private cause of action, Plaintiff's claims for damages or injunctive relief must fail as a matter of law. *See Alexander,* 532 U.S. at 286–87, 121 S.Ct. 1511; *Casas,* F.3d at 520–21.

■ Plaintiff also claims that the FCC violated Plaintiff's right to due process under the Fifth Amendment when it allegedly "utilize[d] the unresolved NAL to destroy [Plaintiff's] business by attacking its chain of product distribution." Pl.'s Compl. ¶¶ 28–29. This claim also rests upon the FCC's purported violation of § 504(c). However, Plaintiff's interpretation of this statute is at odds with the FCC's established practice and procedure. Specifically, § 504(c) states:

> In any case where the Commission issues a notice of apparent liability looking toward the imposition of a forfeiture under this chapter, that fact shall not be used, in any other proceeding before the Commission, to the prejudice of the person to whom such notice was issued, unless (i) the forfeiture has been paid[.]

47 U.S.C. § 504(c); *see also* Pl.'s Compl. ¶¶ 13–44.

In its Forfeiture Policy Statement, the FCC has interpreted the restrictions in § 504(c) to apply only in proceedings against the party to whom the NAL was issued, not with regard to third parties,

and then in reference to situations such as "the renewal of a license, for example, or with respect to the imposition of other sanctions." Forfeiture Policy Statement, 12 FCC Rcd. 17087, 17103 (1997). In other words, the restrictions in 504(c) are designed to prevent the FCC from using the fact of an NAL as grounds against the offending party for denying a license or increasing a subsequent fine. The FCC's interpretation does not prevent the FCC from citing the existence of an NAL in citations against other parties. *See id.* Nor does the FCC's interpretation appear to consider the collateral detriment to Plaintiff of citing an NAL to other parties to be the "prejudice" Congress intended to prevent when it passed § 504(c).[7] *See id.*

At this stage of the proceedings, it is irrelevant whether the FCC is correct in its interpretation. The FCC's interpretation of 504(c) has been included in its Forfeiture Policy Statement and thus represents the policy and practice of the FCC. In order for Plaintiff to challenge this policy as contrary to the plain meaning of the statute, the doctrine of primary jurisdiction requires that—not unlike the requirement for an administrative claim under the FTCA—Plaintiff must first file a motion for a declaratory ruling from the FCC. *Action for Children's Television v. FCC,* 827 F.Supp. 4, 10 (D.D.C.1993), *aff'd,* 59 F.3d 1249 (D.C.Cir.1995) (citing *FCC v. ITT World Commc'ns, Inc.,* 466 U.S. 463, 468 n. 5, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984); *Writers Guild of Am., West v. Am. Broad. Co.,* 609 F.2d 355, 363–66 (9th Cir.

---

**7.** Plaintiff notes that the FCC's interpretation in its official policy statement does not specifically preclude Plaintiff's interpretation and only provides "some situations in which the provision might be applied." Pl.'s Resp. 8 (emphasis omitted). Plaintiff further argues that a plain reading of the statute allows for its interpretation. *Id.* at 7. The Court's plain reading of the statute appears to allow for

either interpretation. Given the clear statutory intent to reserve to courts of appeals questions of regulatory interpretation of the FCC's policy and practices, and given the other grounds for denying Plaintiff's claims, the Court declines to entertain these issues of interpretation, which are best left for the court of appeals. See *Action for Children's Television v. FCC,* 827 F.Supp. at 10.

1979), *cert. denied,* 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980)). From there, any appeal of such a declaratory ruling goes to the court of appeals, to which Congress granted exclusive jurisdiction over any attempt to "enjoin, set aside, annul, or suspend any order of the [FCC][.]" 47 U.S.C. § 402(a); *see also* 28 U.S.C. § 2342(1) (court of appeals has "exclusive jurisdiction to enjoin, set aside, suspend ... or to determine the validity of ... all final orders of the [FCC] made reviewable by section 402(a) of title 47"); *see also Bywater Neighborhood Ass'n v. Tricarico,* 879 F.2d 165, 167 (5th Cir.1989); *Rocky Mountain Radar,* 158 F.3d at 1122. In addition to final orders, the circuit court's exclusive jurisdiction has been interpreted to include review of "all policies, practices, and regulations adopted by the [FCC]" as well as "any suit seeking relief that might affect the Circuit Courts' future jurisdiction under the Communications Act." *Action for Children's Television,* 827 F.Supp. at 10 (citing 47 U.S.C. § 402(a); 28 U.S.C. § 2342(1); *ITT,* 466 U.S. at 468, 104 S.Ct. 1936; *Telecomms. Research & Action Ctr. v. FCC,* 750 F.2d 70, 75 (D.C.Cir.1984)); see also *United States v. Neely,* 595 F.Supp.2d 662, 669 (D.S.C.2009) (district court lacks jurisdiction over claims against FCC's Forfeiture Policy Statement).[8] Accordingly, this Court lacks jurisdiction over Plaintiff's claims that the FCC's practice violates Plaintiff's rights to due process.

In conclusion, Plaintiff has failed to exhaust administrative remedies before filing suit in this Court. Plaintiff has cited no valid state tort or federal statute creating a private cause of action for the harms allegedly caused. Finally, Plaintiff's claims specifically challenge one of the FCC's standing practices, which has been interpreted and is discussed in one of the FCC's policy statements. Congress has reserved review of such policies and practices exclusively for the courts of appeals. Consequently, Plaintiff's claims fail as a matter of law.

## B. The FCC's Counterclaim

With Plaintiff's claims dismissed, the Court is left with the Government's Counterclaim. As stated above, the FCC issued Plaintiff an NAL on January 31, 2007, concluding that Plaintiff's products RMR–C450 and RMR–S201 were "intentional radiators" and thus in violation of the Communications Act and FCC regulations. NAL ¶¶ 7–10. On August 16, 2007, the FCC issued Plaintiff a Forfeiture Order, directing Plaintiff to pay a $25,000 penalty. *In re Rocky Mountain Radar,* 22 FCC Rcd. 15174 (Aug. 16, 2007) (Forfeiture Order); Gov't's Mot. Ex. 7. The Government's Counterclaim seeks enforcement of the FCC's Forfeiture Order against Plaintiff. Gov't's Countercl. ¶¶ 46–51.

The Communications Act requires that "any suit for recovery of a forfeiture imposed pursuant to the provisions of this chapter shall be a trial de novo." 47 U.S.C. § 504(a); *see also id.* § 503(b)(3)(B) (establishing district courts as forum for government collection actions); 28 U.S.C. § 1345 (district courts have original jurisdiction over suits commenced by the Government). While "[t]he statutory scheme for the FCC divests district courts of jurisdiction over appeals from most final orders ... [t]he district courts ... have 'a sliver of jurisdictional pie' for enforcement of FCC orders imposing a monetary forfeiture penalty." *Rocky Mountain Radar,* 158 F.3d at 1122 (quoting *Action for Chil-*

---

**8.** Although not raised by either party, this ground for denying review also precludes this Court from assuming jurisdiction under § 702 of the Administrative Procedures Act. *See* 5 U.S.C. § 702; *see also Bywater,* 879 F.2d at 168–69.

*dren's Television,* 827 F.Supp. at 10); *see also AT & T v. FCC,* 323 F.3d 1081, 1084–85 (D.C.Cir.2003) (exclusive jurisdiction over unpaid forfeiture orders remains with district courts).

The FCC is authorized to assess forfeitures against "[a]ny person who is determined by the Commission ... to have ... willfully or repeatedly failed to comply substantially with the terms and conditions of any license, permit, certificate, or other instrument or authorization issued by the Commission" or "willfully or repeatedly failed to comply with any of the provisions of this chapter or any rule, regulation, or order issued by the Commission under this chapter[.]" 47 U.S.C. § 503(b)(1)(A)-(B); *see also* 47 C.F.R. § 1.80(a)(1)-(2).

Plaintiff argues that the FCC has failed to follow its own procedures in assessing forfeitures. Pl.'s Mot. 5. Plaintiff further argues that there remain questions of fact as to whether the RMR–450 and the RMR–S201 are "intentional radiators," thus precluding judgment as a matter of law against Plaintiff regarding the forfeiture. Pl.'s Resp. 10–17. The Court will address each argument in turn.

### 1. Whether the FCC violated its procedures in issuing a forfeiture

Plaintiff first argues that the Court must dismiss the Government's Counterclaim because the FCC violated its own procedures in its administrative action for forfeiture against Plaintiff. Pl.'s Mot. 5.

In most cases, prior to assessing a forfeiture, the FCC must first issue "a citation of the violation charged" and "give[ ] a reasonable opportunity for a personal interview with an official of the Commis-

sion[.]" 47 U.S.C. § 503(b)(5); *see also* 47 C.F.R. § 1.80(d). Therefore, the general rule is that the FCC may issue an NAL only after the FCC issues an official citation. *See* 47 U.S.C. § 503(b)(4), 47 C.F.R. § 1.80(f). After the FCC issues an NAL, the alleged violator has 30 days to file a response as to why the forfeiture should not be imposed or why it should be reduced. 47 C.F.R. § 1.80(f)(3). The FCC must then reply to any such response by "canceling or reducing the proposed forfeiture or requiring that it be paid in full...." *Id.* § 1.80(f)(4). If no response by the party to the NAL is forthcoming, or if the party fails to pay the fine once the FCC has issued a final forfeiture order, the FCC may seek judicial enforcement of its forfeiture order. *Id.* § 1.80(f)(5).

#### a. The FCC's alleged violations of 47 C.F.R. § 1.80(d)

■ Plaintiff argues that the FCC failed to follow its own procedures because it did not first issue Plaintiff an official citation before issuing a notice of liability. Pl.'s Mot. 5. Plaintiff is incorrect for two reasons. First, the FCC is only required to issue official citations to a person who "does not hold a license, permit, certificate, or other authorization issued by the Commission...." 47 U.S.C. § 503(b)(5); 47 C.F.R. § 1.80(d). Plaintiff has a Part 15 equipment certification for the RMR–C450. *See* NAL ¶ 4. Accordingly, the official citation requirement of § 1.80(d) does not apply.

Plaintiff argues that the citation requirement in § 1.80(d) does apply because the FCC's charges are not related to Plaintiff's certification.[9] Pl.'s Reply 4. Specifically,

---

9. The Court notes that in its Motion, Plaintiff argues that "[t]here is no dispute whether [Plaintiff] is the holder of a license, permit, certificate, or other authorization issued by the Commission—[Plaintiff] is not." Pl.'s

Mot. 5. Only after being reminded by the Government that it does in fact hold a Part 15 certification for one of the devices in question does Plaintiff advocate that the license and

Plaintiff argues the alleged violation regarding the RMR–C450 is that it is an "intentional radiator," and Plaintiff's certification is for the RMR–C450 as a radar detection device. *Id.* Therefore, Plaintiff argues that the FCC would only be excused from not issuing a citation if the charges in the NAL were related to a violation of that certification. *Id.*

Assuming Plaintiff's actions are not a direct violation of Plaintiff's certification for the device in question, there is no reason for the Court to read the statute and regulations so narrowly as to require a direct correlation between the terms of Plaintiff's certification and the nature of its violation. Both 47 U.S.C. § 503 and 47 C.F.R. § 1.80 allow for forfeitures against those who fail to comply with a certification and those who otherwise violate FCC rules and regulations. *See* 47 U.S.C. § 503(b)(1)-(2); 47 C.F.R. § 1.80(a)(1)-(2). This same statute and this same regulation also state that the FCC is excused from issuing a citation before issuing an NAL in the event an alleged violator has a license or certification. 47 U.S.C. § 503(b)(5); 47 C.F.R. § 1.80(d). Nothing in this statute or regulation restricts the FCC's prerogative of directly issuing an NAL to a party who has a certification to the terms of that certification, particularly when the NAL directly involves the devices in question. The principle animating these rules, as Plaintiff itself argues, is that the FCC must provide notice of potentially unlawful behavior before it may issue an NAL. *See* Pl.'s Resp. 14–15; Pl.'s Reply 3–4. The fact that Plaintiff holds a certification for one of the items in question demonstrates that Plaintiff was on notice of the manner in which its devices could violate the Communications Act and FCC regulations. Accordingly, as Plaintiff is an FCC certification holder, and that certification is for the charge must be related. *See* Gov't's Resp.

one of the devices that purportedly violates FCC's regulations, the FCC was not required by 47 C.F.R. § 1.80(d) to first issue an official citation before issuing an NAL.

Plaintiff's argument that the FCC should have filed an official citation is incorrect for a second reason. Even if the regulation should be read narrowly to require the FCC to issue official citations unless the violation is directly related to terms of a license or certification, 47 C.F.R. § 1.80(d) states that "[w]hen the requirements of this paragraph have been satisfied with respect to a particular violation by a particular person, a forfeiture penalty may be imposed upon such a person for conduct *of the type in the citation* without issuance of an additional citation." 47 C.F.R. § 1.80(d) (emphasis added). In the instant case, the FCC charged Plaintiff in its NAL and Forfeiture Order with manufacturing, marketing and selling police radar jammers that are "intentional radiators" in violation of the Communications Act and FCC regulations. *See also* 47 U.S.C. § 302a(b); 47 C.F.R. § 2.803; 47 C.F.R. § 15.3(*o*). The FCC has already issued an Official Citation to Plaintiff regarding the same type of conduct in the 1997 Spirit II case regarding an allegedly similar device. *See* Official Citation, Feb. 13, 1997. Indeed, in its 1997 FCC Order, the FCC stated that the Spirit II "and any other similar device" acting as an "intentional radiator" was in violation of FCC rules and regulations. *See* 1997 FCC Order ¶ 7. If the RMR–C450 and RMR–S201 are in fact "intentional radiators" designed to interfere with police radar devices as charged in the FCC's NAL and Forfeiture Order, then Plaintiff's actions in the instant case are clearly "of the type" previously cited by the FCC in the Spirit II

3; Gov't's Mot. 24; Pl.'s Reply 3–4.

case.[10] *See* 47 C.F.R. § 1.80(d). Accordingly, the FCC was under no obligation to issue an additional citation before issuing Plaintiff an NAL.

### b. The FCC's alleged violations of 47 C.F.R. § 1.80(f)(3)

■ In addition to the FCC's alleged failure to issue an official citation, Plaintiff also claims that the FCC "failed to address [Plaintiff's] Response to the NAL entitled Petition for Reconsideration and Cancellation of Proposed Forfeiture," as required by 47 C.F.R. § 1.106. Pl.'s Compl. ¶ 22; *see also* 47 C.F.R. § 1.80(f)(3). However, there is no evidence that Plaintiff ever filed such a document with the FCC. Plaintiff has filed no copy of this document with the Court, nor does it provide evidence of such a document in its affidavits and declarations. Once again, the only evidence on file with the Court demonstrates that Plaintiff filed no such document with the FCC. *See* Gov't's Mot. (Berthot Decl.) ¶¶ 4–6 (stating that no response to FCC's NAL was ever filed with the agency). Accordingly, absent any evidence that Plaintiff filed this document with the FCC, no question of fact remains on this issue.

### c. The FCC's alleged violations of 47 U.S.C. § 504(c)

Finally, Plaintiff argues that the FCC's reference to Plaintiff's NAL in the citations the FCC sent to Plaintiff's distributors are violations of 47 U.S.C. § 504(c) and are further evidence of procedural failures in the forfeiture proceedings. Pl.'s Mot. 5. However, the FCC's reference to Plaintiff's NAL is collateral to the forfeiture proceedings against Plaintiff, the latter being the only issue over which this Court has jurisdiction. As stated previously, the FCC has a published practice regarding § 504(c). Any dispute over this practice must be addressed first by the FCC and then appealed to the Fifth Circuit. But even assuming that Plaintiff's interpretation of § 504(c) is correct, and that the FCC is prohibited from referencing Plaintiff's NAL in proceedings with other parties, the FCC's reference to Plaintiff's NAL in the citations to Plaintiff's distributors relates only to whether Plaintiff was harmed by the FCC's behavior and whether those harms are actionable, not whether the FCC followed the proper procedure in issuing a Forfeiture Order.

### d. Conclusion

In conclusion, Plaintiff has failed to demonstrate that the FCC has violated its own regulations when it instituted forfeiture proceedings against Plaintiff. As an FCC certification holder with a previous citation for selling and marketing "intentional radiators" that interfered with police radar, Plaintiff was on notice under the applicable statutes and regulations that "conduct of the type in the citation" was prohibited and subject to forfeiture proceedings. Accordingly, the FCC was not required by 47 C.F.R. § 1.80(d) to issue an additional official citation before issuing an NAL. Finally, Plaintiff's alleged violations of 47 U.S.C.

---

**10.** Plaintiff argues that the language "any similar device" in the FCC's Final Order is dicta and does not appear in the Spirit II Official Citation or in the ordering clauses of the Order and therefore cannot override the FCC's responsibility to issue an additional citation in the instant case. *See* Pl.'s Reply 4–6. However, nowhere does § 1.80(d) require that the official citation cite all possible offending actions that a party may engage in for the citation to be applicable. The regulation merely requires that the subsequent behavior be "of the type" cited to in the initial citation for it to apply. *See* 47 C.F.R. 1.80(d). The FCC's 1997 Order, which stated that "any similar device" was in violation of the FCC rules and regulations, further put Plaintiff on notice, but such language was not required for the 1997 Official Citation to apply to the instant case.

§ 504(c) are collateral to the forfeiture proceedings. Accordingly, Plaintiff's Motion seeking dismissal of and summary judgment on the Government's Counterclaim fails as a matter of law.

### 2. Whether the RMR–C450 and RMR–S201 are "intentional radiators"

 The sole issue remaining in this case is whether Plaintiff's products—the RMR–C450 and the RMR–S201—are "intentional radiators" as the term is defined in 47 C.F.R. § 15.3(*o*). Both parties agree that this is the "key question" to determining Plaintiff's liability. *See* Def.'s Mot. 20; Pl.'s Resp. 11.

Despite Plaintiff's arguments to the contrary, there is no question of fact regarding the nature and functionality of the RMR–C450 and RMR–S201 devices. The evidence regarding these devices is a "Technical Report for C450 and S210 [sic]" provided by Michael Churchman, founder and owner of Rocky Mountain Radar, in Plaintiff's Response Exhibit D ("Technical Report"); a "Response of the FCC to Plaintiff's Technical Report for C450 and S210 [sic]," in the Government's Motion Exhibit 11 ("Response to Technical Report"); and the FCC's Post Grant Sample Technical Reports. The evidence regarding these devices is consistent: each device is specifically designed to receive a signal sent from a police radar gun, modify that signal, and then send the signal back to the radar gun in its modified form with the intent to confuse the radar gun and make the radar gun unable to calculate the vehicle's speed where the device is located. Indeed, the devices are marketed and sold for this very purpose.

Starting with the Government's evidence, the FCC's Post Grant Sample Technical Reports state that the RMR–C450 and RMR–S201 each contain three elements: an FM chirp generator, a mixer diode and a dual ridge wave-guide antenna. FCC's RMR–C450 Report 3; FCC's RMR–S201 Report 3. The Reports further state:

> When the scrambler is hit by a signal it runs through the mixer, adding the FM chirp to mix up the signal and using the antenna, reflect back this new signal to the radar gun. The radar gun's computer can't recognize the new signal; it gets confused and won't display a reading on the gun, leaving a blank screen.

FCC's RMR–C450 Report 3; *see also* FCC's RMR–S201 Report 3.

The Reports further state that the FCC tested the devices in three different ways to detect radiated emissions. First, the FCC placed the devices near an active police radar gun and a tuning fork. Striking a tuning fork is a standard calibration method to see if the radar gun has a clear Doppler tone and to guarantee that the radar gun produces valid readings. FCC's RMR–C450 Report 5; *see also* FCC's RMR–S201 Report 5. In both cases, when the device was turned on and the tuning fork was struck, the police radar gun was unable to operate effectively when in proximity to the device. FCC's RMR–C450 Report 5; *see also* FCC's RMR–S201 Report 4. Second, the devices were activated and placed in vehicles travelling at thirty, forty and fifty miles per hour. A stationary radar gun was activated nearby and tracked the vehicles to ascertain their speeds. FCC's RMR–C450 Report 6; *see also* FCC's RMR–S201 Report 5. Once again, the placement of the devices in the vehicles caused the radar gun to cease functioning properly, and the radar gun was unable to track the vehicle's speed. FCC's RMR–C450 Report 6; *see also* FCC's RMR–S201 Report 5. Third, the devices were placed on a rotating table, and a horn antenna was used to measure any radiated emissions. The FCC's RMR–C450 report stated that the RMR–

C450's peak radiated emission occurred at 11.225 GHz. FCC's RMR–C450 Report 7–9. The RMR–S201 generated no emissions. FCC's RMR–S201 Report 5. Based on these tests, the Post Grant Technical Reports concluded that the RMR–C450 and the RMR–S201 were intentional radiators designed to interfere with licensed radio services. FCC's RMR–C450 Report 10; *see also* FCC's RMR–C450 Report 5.

While Plaintiff's legal conclusions differ from those of the FCC, Plaintiff presents no facts in its Technical Report that contradict the relevant evidence in the FCC's Post Grant Technical Reports. Indeed, Plaintiff's Technical Report confirms that both the RMR–C450 and the RMR–S201 have a "Scrambler" which "operate[s] in an identical fashion," and that both devices are designed specifically to scramble the signal of police radar guns. Technical Report 7. The Technical Report further states:

> The Scrambler as utilized in these models consists of an antenna, mixer diode and audio generator. The incoming signal originated in the radar is mixed with an audio generator and passively reflected back to the radar source. The audio signal is mixed with the incoming radar signal just as any moving object will impart an additional audio signal to the radar signal. When the radar signal is received it is mixed with the originating radar signal to remove that radar frequency so it may process the audio frequency that remains. When the return is from a moving object, this audio

frequency is proportional to the speed of the object. This is the "Doppler Shift" by which all police radar operates. The return signal from the scrambler is mixed with the originating signal to remove it and that resulting audio frequency is available for processing. It is here that the processor may become confused by having multiple audio signals to process (just as in heavy traffic). There are signal processing techniques that can be employed to process multiple signals but the Radar manufacturers chose not to use them.

*Id.* at 7–8.

The Technical Report concludes, however, that while the devices are designed to scramble police radar, neither the RMR–C450 nor the RMR–S201 is an "intentional radiator." *Id.* at 10. This is true, the Technical Report argues, because the devices generate no emissions themselves, and because the radio emission that the devices send back to the police radar gun did not originate with the devices. *Id.* at 9. The Technical Report argues that "an intentional radiator must intentionally generate a signal." *Id.* at 9.[11]

Plaintiff's legal arguments in its Response are similar to those in its Technical Report. *See* Pl.'s Resp. 11–13. However, Plaintiff's arguments and the Technical Report's conclusions are erroneous based on the evidence, the standard of review the Court is required to apply to the FCC's interpretation of its own regulations, and case law examining similar devices.

---

**11.** Plaintiff also presents a 2002 "Test Report," which tested the "RMR C430" in September 2002. *See* Pl.'s Resp. Ex. E ("DTT Test Report"). However, it is unclear whether this device is functionally identical to the RMR–C450. Moreover, the DTT Test Report demonstrated only that the RMR–C430 radiated no emissions when placed on a nonconductive wooden table. *See id.* This conclusion is not different from the FCC's conclusion regarding the RMR–S210. However, as will be discussed *infra,* the fact that the device did not generate RF energy in the absence of an active police radar is a necessary but not sufficient circumstance in determining that the device is not an "intentional radiator."

First, it is uncontroverted that Plaintiff's devices are marketed and sold for a purpose that directly violates the FCC's publicly stated interpretation of its regulations. In 1996, the FCC issued a Public Notice warning against the use of radar jammers, which the FCC defined as "transmitters tuned to interfere with ('jam') a radar signal [emitted by a police radar]". *See* Public Notice, "FCC Regulates Radar Transmitters, But Not Radar Detectors," *available at* http://www.fcc.gov/Bureaus/Mass_Media/Databases/documents_collection/da96–2040.pdf (last viewed June 4, 2009). The Public Notice further stated that "[t]he intentional use of jammers is considered 'malicious interference' and is strictly prohibited by the Communications Act of 1934, as amended, as well as by the FCC Rules." *Id.* The FCC warned that "[a]nyone using a jammer risks such penalties as losing an FCC licenses [sic], paying a fine, or facing criminal prosecution." *Id.* The Public Notice also stated that devices which merely detect radar, but do not interfere with it, are permissible. *Id.* There is no question that Plaintiff specifically designed the RMR–C450 and RMR–S201 to interfere with police radar guns.

■ In addition to the general Public Notice, both Post Grant Sample Technical Reports specifically conclude that the RMR–C450 and RMR–S201 violate the FCCs ban on "intentional radiators." FCC's RMR–C450 Report 10; *see also* FCC's RMR–C450 Report 5. This Court considers agency interpretations of its regulations according to the standard set forth in *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), and restated in *Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), which held that an agency's interpretation of its own regulations is of controlling weight unless "plain-

ly erroneous or inconsistent with the regulation." *Bowles,* 325 U.S. at 414, 65 S.Ct. 1215; *see also Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994); *Belt v. EmCare, Inc.,* 444 F.3d 403, 408 (5th Cir.2006). In *Paradissiotis v. Rubin,* 171 F.3d 983 (5th Cir.1999), the Fifth Circuit held that this standard requires greater deference than that afforded to agency interpretations of statutes. *Id.* at 987; *cf. Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (courts must defer to reasonable agency interpretations of ambiguous statutes). Indeed, "[w]hen an agency applies its 'regulation to complex or changing circumstances,' . . . this 'calls upon the agency's unique expertise and policymaking prerogatives[.]' " *Rocky Mountain Radar,* 158 F.3d at 1124 (quoting *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 151, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991)). In such cases, "courts must 'presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers.' " *Id.* (quoting *Martin,* 499 U.S. at 151, 111 S.Ct. 1171).

■ This Court applies a two-step test to determine whether an agency interpretation is entitled to deference under *Auer.* *See Belt,* 444 F.3d at 408. First, the Court asks whether the regulation is ambiguous with respect to the question considered. *Id.* (citing *Christensen v. Harris County,* 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000); *Moore v. Hannon Food Svc., Inc.,* 317 F.3d 489, 495 (5th Cir.2003)) (internal quotes omitted). If the regulation is unambiguous, the Court may consider the agency interpretation according to its persuasive power. *Id.* If, however, the regulation is ambiguous with respect to the question considered, an agency's interpretation controls unless it is "plainly erroneous or inconsistent with the

regulation." *Belt,* 444 F.3d at 408 (quoting *Auer,* 519 U.S. at 461, 117 S.Ct. 905); *see also Christensen,* 529 U.S. at 588, 120 S.Ct. 1655.

There is nothing ambiguous about the FCC's ban against devices interfering with police radar, nor is there anything ambiguous about the term "intentional radiator" as it applies to the RMR–C450 and RMR–S201. As stated above, an "intentional radiator" is "[a] device that intentionally generates and emits radio frequency energy by radiation or induction." 47 C.F.R. § 15.3(*o* ). Any device that is deemed an unlicensed "intentional radiator" which causes "harmful interference" with "a radiocommunications service" violates the Communications Act and FCC regulations. *See* 47 U.S.C. § 302a(b); 47 C.F.R. §§ 2.803, 15.3(m),(*o* ). Plaintiff has stated that when its devices receive an incoming signal from a police radar gun, the devices mix the incoming signal with internal circuitry which changes the Doppler tone, after which the signal is "passively reflected back to the radar source." Technical Report 7. The intent of returning this signal in a mixed state is to confuse the radar gun. *Id.* By modifying the signal in such a way as to change the way it interacts with the radar gun, Plaintiff's devices can be properly said to "generate" or "bring into being" a new signal, even if the RF energy originated with the police radar gun. *See* The American Heritage Dictionary of the English Language (4th Ed. 2009), *available at* http://dictionary.reference.com/browse/generate, (last viewed June 10, 2009) ("generate" means "to bring into being; give rise to"). Plaintiff argues that such an interpretation would make "every moving object with within the range of the radar gun ... a radio energy generator." Technical Re-

port 10. Such is not the case. Unlike other moving objects that naturally interact with a police radar gun by bouncing back a signal, Plaintiff's devices are intentionally designed to mix the incoming signal with additional radio noise, thus in the process creating a "new" signal "generated" by the device.[12]

Indeed, Plaintiff's description of the RMR–C450 and the RMR–S201 is the functional equivalent of the Spirit II, which the 10th Circuit found to be an "intentional radiator" in 1998. *See Rocky Mountain Radar,* 158 F.3d at 1120; *id.* at 1123–24. Like the two devices in the instant case, the Spirit II " 'receives a radar signal,' then 'blends the signal with [another sound]' and reflects it back so it 'confuses the computer inside the radar gun.' " *Id.* at 1120 (citing a Spirit II advertisement). The fact that part of the signal being "generated" by the Spirit II actually originated in a police radar gun did not save the device from being termed an "intentional radiator," nor does that fact save the RMR–C450 or RMR–S201. *See id.* at 1124.

Plaintiff further argues that the FCC's RMR–S201 Test did not demonstrate an emission within the prohibited range when the device was placed on a table and measured with a horn antenna. Pl.'s Resp. 11. Moreover there appears to be a question of fact as to whether the RMR–C450 emits RF energy absent the presence of an active police radar gun. *Compare* FCC's C450 Report (finding the RMR–C450 emits radiation at a frequency of 11.23 GHz) *with* Technical Report 8 (stating the device emits no signals in prohibited range). However, the tests Plaintiff cites to and disputes were simply one set of three that the FCC undertook to detect emissions. The results of these tests do not contro-

---

**12.** Plaintiff has itself labeled part of the internal circuitry creating this new signal as an "audio generator." Technical Report 7.

vert the conclusion that both devices "generate" new signals when interacting with a signal sent police radar gun. Accordingly, regardless of whether the RMR–C450 and RMR–S201 generate new signals outside the presence of a police radar gun, the devices are specifically designed to do so in the presence a police radar gun, and therefore fall within the unambiguous meaning of the term "intentional radiator."

■ Assuming, however, there is ambiguity in the term "generate," as it is used in the definition of "intentional radiator," there is nothing in the FCC's interpretation that is "plainly erroneous or inconsistent with the regulation." *Bowles*, 325 U.S. at 414, 65 S.Ct. 1215. Indeed, as the 10th Circuit noted:

> a broad reading of the word ["generate"] furthers a stated aim of the Communications Act, which is to "govern[ ] the interference potential of devices which in their operation are capable of emitting radio frequency energy." 47 U.S.C. § 302a; *see also id.* at § 333 (prohibiting willful or malicious interference with licensed or authorized radio communications). It can also be reconciled with the purpose of the regulations, which is to regulate and minimize interference between users of the electromagnetic spectrum.

*Rocky Mountain Radar*, 158 F.3d at 1124.[13]

In conclusion, there remains no issue of fact in the instant case. Plaintiff's RMR–

C450 and RMR–S201 receive RF energy from a police radar gun, mix it with an FM chirp designed to alter and render the signal unreadable, and then reflect it back to the radar gun. As such, they "generate" RF energy and are "intentional radiators" as that term is defined in the FCC regulations which cause "harmful interference" to a police "radiocommunications service." 47 C.F.R. §§ 15.3(m), (*o* ). As Plaintiff has marketed and sold these devices, Plaintiff has violated the Communications Act and FCC regulations. 47 U.S.C. § 302a; 47 C.F.R. § 2.803.

## IV. CONCLUSION

Plaintiff has no claim or cause of action over which this Court can assume jurisdiction. Accordingly, Plaintiff's claims are **DISMISSED.** There also remains no question of fact regarding the Government's Counterclaim to enforce its August 16, 2007, Forfeiture Order. Plaintiff's RMR–C450 and RMR–S201 are "intentional radiators" as that term is defined in FCC regulations and are thus in violation of the Communications Act and FCC regulations. Accordingly, the Government's Motion (**Doc. No. 42**) is **GRANTED** and Plaintiff's Motion (**Doc. No. 41**) is **DENIED.**

**SO ORDERED.**

---

**13.** Plaintiff also argues that a question of fact exists over whether the RMR–C450 and RMR–S201 cause "harmful interference" pursuant to 47 C.F.R. § 15.3(m), which prohibits any emission that "seriously degrades, obstructs or repeatedly interrupts a radio communications service[.]" Pl.'s Resp. 12. Specifically, Plaintiff argues that "a police radar gun is not a 'radio communications service.' " *Id.* Once again, Plaintiff's "question of fact" is really a dispute over the legal interpretation of an agency regulation, one which appears unambiguous on the surface and which, assuming ambiguity, is subject to deference for the agency's interpretation. As stated in the FCC's Response to Technical Report, "[a] police radar derives information from reflected radar pulses to determine location and speed of objects. This meets the general term [of 'radio communications service']. By deliberately attempting to disrupt the function of FCC-approved police radar, plaintiff's jamming devices cause unlawful harmful interference." Response to Technical Report 5.